**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 21, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ATLAS BIOLOGICALS, INC.,

    Plaintiff - Appellee,

v.

THOMAS JAMES KUTRUBES, an
individual; PEAK SERUM, INC., a
Colorado corporation; PEAK SERUM,
LLC, a dissolved Colorado limited liability
company,

    Defendants - Appellants.

No. 19-1404
(D.C. No. 1:15-CV-00355-CMA-KMT)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH**, **BRISCOE**, and **EID**, Circuit Judges.
_____

Thomas James Kutrubes sold bovine serum products for Atlas Biologicals

until he left to form a competitor, Peak Serum.  Before departing, Kutrubes took

confidential customer information from Atlas and emailed several Atlas customers to

solicit business for Peak Serum, falsely claiming that Peak Serum was related to

Atlas.  Peak Serum and Kutrubes (collectively, "Peak") then sold mislabeled serum.

Atlas sued.  After a bench trial, the district court awarded Atlas its losses, Peak's

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

profits, and attorneys' fees.  Peak appeals, arguing that its conduct did not cause Atlas the damages it recovered below.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm because the district court did not clearly err in finding Peak liable.

**I.**

**a.**

The following background is largely derived from the district court's findings of fact.  Plaintiff-Appellee Atlas Biologicals, Inc., is based in Fort Collins, Colorado. The company specializes in products involving bovine serum, a fluid derived from cow blood leftover by the commercial beef industry.  Fetal bovine serum ("FBS") is used for cell culture and other research in the medical, veterinary, and biological sciences.  A lucrative commodity, a single bottle of FBS costs hundreds of dollars, and customers like academic laboratories and biotech companies will often purchase dozens or even hundreds of bottles at a time to ensure consistency.  Atlas sells pure FBS, but it also develops and offers less expensive proprietary products and blends— such as EquaFETAL, Fetal Select, and Fetal Plus.  Atlas's proprietary products "meet[] the specifications" for FBS, but are "purportedly more traceable, consistent in quality, and stable in pricing."  Aplt. App'x Vol. XVII at 3362–63.  During the period relevant here, Atlas's primary owners were the company president Richard Paniccia and Brent Bearden, while Michelle Cheever worked as Director of Quality Assurance.  Defendant-Appellant Thomas James Kutrubes was also on the payroll.

Kutrubes started interning for Atlas in 2005, became a sales manager in 2006, and was promoted to National Sales Manager in 2012.  By 2013, Kutrubes was on the

2

company's board and held a seven-percent stake. By late 2014, however, while still employed by Atlas, Kutrubes had surreptitiously developed a business plan to compete with the company. Kutrubes envisioned a new entity, Defendant-Appellant Peak Serum, that would—just like Atlas—focus on selling serum products to institutions worldwide. After registering Peak Serum as an LLC in October 2014, Kutrubes dissolved that entity and incorporated Peak Serum in Colorado in December 2014.

Around this time, Kutrubes sent numerous company documents from his Atlas email account to his personal account. The documents included Atlas's customer contact lists, a supplier agreement, its quality manual, its organizational chart, a contract manufacturing statement, proofs of labels, a marketing brochure, and emails concerning products. Some of the information came from Atlas's secured, competitively advantageous database of nonpublic customer information. The database cost over a million dollars to develop, and Atlas employees put thousands of hours into it annually. Kutrubes did not have Atlas's permission to take information from the database and was aware of Atlas's confidentiality policies. Atlas employees did not work from home, so the district court did not credit Kutrubes's testimony that he emailed himself the documents to work remotely. Besides, Kutrubes conceded "that he had the development of Peak Serum in mind when he emailed Atlas's customer information to his personal account." *Id.* at 3401.

Having obtained Atlas's customers' information, Kutrubes started emailing various Atlas customers, using Atlas's trademarks and trade names, to solicit

business for Peak Serum. Kutrubes falsely stated that Atlas and Peak Serum were related companies, that Atlas was no longer selling FBS or conducting international sales, and that Peak Serum would be taking over Atlas's international accounts. In these emails, Kutrubes used a signature block that included Atlas's information and logo, and that identified him as Atlas's National Sales Manager. Kutrubes also tried to obtain inventory for Peak Serum by contacting Atlas's suppliers, contract manufacturers, and business partners.

In mid-December 2014, Kutrubes submitted his resignation from Atlas as both employee and director. He told Paniccia and Bearden that he was departing to sell FBS on his own. Before his resignation took effect, Atlas discovered the many emails appropriating its documents and attempting to appropriate its business. Atlas refused Kutrubes's resignation and terminated him for cause. Kutrubes admits to breaching his duty of loyalty to Atlas between October 2014 and December 2014.

In the aftermath of Kutrubes's departure, and "as a result of the confusion caused by Kutrubes's use of Atlas's marks and names in emails promoting Peak Serum," Atlas "lost a large block of business." *Id.* at 3377. But the overlap between Atlas and Peak Serum was not limited to Kutrubes's emails. For example, Kutrubes created an online profile for Peak Serum that used Atlas's marks and information. In early 2015, searching for Atlas Biologicals on the internet would yield customer reviews linked to the Peak Serum name that actually referenced Atlas and Atlas products like EquaFETAL. According to Cheever—and as Kutrubes conceded—this

4

confused Atlas's customers.  Atlas often had to explain to its customers that it was unrelated to Peak.

Early in Peak's operations, the company mislabeled several hundred bottles of FBS.  In accord with "industry best practices" favoring consistency, shared lot numbers assure consumers that multiple bottles of serum comprise "a uniform batch of product" produced by a single manufacturer in a single day.  *Id.* at 3385.  In December 2014, Peak bought 246 bottles of FBS from Rocky Mountain Biologicals, Inc. ("RMBIO"), a contract manufacturer.  RMBIO identified that shipment of serum as Lot 20140331FS.  In March 2015, Peak submitted an affidavit to the United States Department of Agriculture (USDA) stating that Peak Serum Lot 31C141 was "derived entirely" from RMBIO's Lot 20140331FS.  The affidavit was part of Peak's ultimately successful effort to export serum to South Korea, which Cheever testified has "stringent" import requirements.  Aplt. App'x Vol. II at 354.  Peak sold over one thousand bottles of FBS under the lot number 31C141 to former Atlas customers.  Six hundred of those bottles went to Daemyung, a South Korean entity and former Atlas customer.  Aside from the fact that Peak sold far more 31C141 serum than it purchased from RMBIO and represented to the USDA was in existence, chemical analyses of serum samples from Lot 31C141 indicated that Peak labeled what should have been different lots with the same lot number.  At trial, Kutrubes admitted that Peak inaccurately labeled its serum.

**b.**

Atlas sued Peak in February 2015 in the District of Colorado and obtained a temporary restraining order.  The parties stipulated to the bulk of a preliminary injunction but disagreed about whether Peak could contact Atlas customers.  The court held that, "in the absence of a non-solicitation and non-compete agreement between Atlas and Kutrubes, it did not have the authority to enjoin Kutrubes and Peak Serum from contacting all customers and potential customers in Atlas's customer database."  Aplt. App'x Vol. XVII at 3368.

In November 2016, Atlas filed an amended complaint alleging claims for trademark infringement under the Lanham Act; false association[1] under the Lanham Act; trademark and trade name infringement under Colorado law; misappropriation of trade secrets under the Colorado Uniform Trade Secrets Act (CUTSA); conversion and civil theft under Colorado law; deceptive trade practices under the Colorado Consumer Protection Act; breach of fiduciary duty; and breach of contract.[2]  Atlas also sought attorneys' fees.

The district court held a five-day bench trial in March 2018 and issued written findings of fact and conclusions of law in September 2019.  As relevant to this

[1] The district court referred to this claim as "false designation of origin and federal unfair competition."  Aplt. App'x Vol. XVII at 3387.  For ease of reference, we call it false association.

[2] Additional claims for unfair competition under Colorado law and copyright infringement under federal law were later withdrawn by Atlas.

appeal, the district court ruled in Atlas's favor on its false association claim under the Lanham Act, and its trade secrets misappropriation claim under CUTSA. For the Lanham Act claim, the district court awarded Atlas $502,861.88, representing profits lost in 2014 and 2015 due to Peak's conduct. It also awarded Atlas Peak's profits from selling mislabeled FBS in Lot 31C141, trebling that award to $181,425. For the misappropriation claim, which was based on Kutrubes taking content from Atlas's customer database, the district court awarded Atlas $681,946.81, representing Peak's profits on sales to former Atlas customers. It then awarded Atlas another $681,946.81 in exemplary damages because Peak's actions were "attended by circumstances of willful and wanton disregard of Atlas's rights." *Id.* at 3401. These damages totaled $2,048,180.50. The district court also determined that Atlas was entitled to attorneys' fees on the Lanham Act and CUTSA claims, but it put off calculating the exact amount. Peak appealed. After briefing in this appeal began, the district court determined that Atlas was entitled to $308,554.50 in attorneys' fees. Atlas then moved to strike Peak's attorneys' fees arguments and Peak opposed.

## II.

Peak appeals the district court's damages awards for Atlas's false association Lanham Act claim, and its trade secret misappropriation CUTSA claim. Peak also challenges the attorneys' fees awarded under those claims. On appeal from a bench trial, we review factual findings for clear error and legal conclusions de novo. *See Holdeman v. Devine*, 572 F.3d 1190, 1192 (10th Cir. 2009). Findings of fact are only clearly erroneous if "unsupported in the record, or if after our review of the record

7

we have the definite and firm conviction that a mistake has been made." *Id.* (quoting

*La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1177 (10th Cir. 2009)).

On appeal, Peak's overarching contention is that its conduct was not the

"proximate cause" of Atlas's damages, and the district court erred by finding

otherwise. Aplt. Br. at 2.[3] Proximate cause can have a legal component, but Peak's

arguments are consistently factual. Because Peak challenges a factual finding of the

district court, we review for clear error. *See Holdeman*, 572 F.3d at 1192. Because

the district court's determination that Peak injured Atlas finds support in the record,

we affirm the damages awarded under Atlas's Lanham Act and CUTSA claims. We

also conclude that the district court did not reversibly err in trebling part of the

---

[3] At times, Peak seems to be arguing that it was held liable under the Lanham Act due to an errant finding of a likelihood of confusion, one of the elements of Atlas's claim. *See* 15 U.S.C. § 1125(a)(1)(A). For example, under a heading ostensibly about proximate cause, Peak writes that, "[w]ith regard to the [likelihood of confusion] element, the record was largely void of evidence to indicate that there was deception," and "considerable evidence . . . undermined Atlas' allegations of confusion in the market." Aplt. Br. at 25–26. Elsewhere, however, it seems clearer that Peak's theory is actually that the lack of confusion evidence linked to the time when Peak made its profits and Atlas suffered its losses means that Peak's earlier misrepresentations did not proximately cause injury to Atlas. *See id.* at 24. We think Peak fails to develop an independent argument that the district court's finding of a likelihood of confusion, which supported Peak's Lanham Act liability, was in error, so we need not reach that issue. *See Kelley v. City of Albuquerque*, 542 F.3d 802, 819 (10th Cir. 2008). But even if we did, our deferential review would be for clear error. *See John Allan Co. v. Craig Allen Co. L.L.C.*, 540 F.3d 1133, 1138 (10th Cir. 2008) (likelihood of confusion is a factual finding). Even at a quick glance, the record contains abundant support for the district court's finding of a likelihood of confusion, including Kutrubes's misrepresentations about Atlas, Kutrubes's use of Atlas credentials to advertise Peak Serum, the overlap between Atlas's and Peak Serum's online presences, and other evidence.

Lanham Act damages and awarding exemplary CUTSA damages. Because we affirm the underlying damages, we have no basis for disturbing the award of attorneys' fees.

**a.**

We start with the district court's award of $502,861.88, representing Atlas's losses in 2014 and 2015, on Atlas's false association claim. Under the Lanham Act, a prevailing plaintiff is "entitled, . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). But Peak's arguments do not concern the scope of § 1117(a)—indeed, Peak does not cite § 1117(a) in either of its briefs. Nor does Peak contest the specifics of the district court's method of calculating damages. Rather, Peak appears to categorically dispute its underlying liability for damages by challenging the district court's finding that Peak's misconduct proximately caused any compensable injury to Atlas. *See* Aplt. Br. at 1 (framing first issue as whether the district court "erred by awarding damages" for Atlas's Lanham Act claim); *see also id.* at 43. As the Supreme Court has explained, Lanham Act liability requires a showing of proximate cause. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132–34 (2014). Specifically, "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's" conduct, which "occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 133.

Here, the district court found that "Atlas was damaged by . . . Kutrubes's misleading emails to Atlas's customers and prospective customers . . . [which] caused

9

confusion in the market, which had a deleterious effect on Atlas's sales." Aplt. App'x Vol. XVII at 3388. The court further found that "Atlas ha[d] proven both causation and [the] amount of its actual damages." *Id.* at 3389. On clear error review, what matters is whether the record contains adequate support for the district court's conclusion that Peak caused Atlas's damages. It does. The district court received extensive evidence that Peak's misrepresentations about Atlas and Peak would and did confuse customers, and it heard expert testimony that confusion can cause anticompetitive harms, even in the absence of sales by a competitor. Trial testimony indicated that the serum industry "is a small industry and word gets out," Aplt. App'x Vol. III at 551, and that Kutrubes's misrepresentations would "sour[]" customers' relationships with Atlas. Aplt. App'x Vol. IV at 694. Moreover, the record suggests that, in 2014 and 2015, Atlas lost many former customers, and its sales suffered as Peak's soared. Multiple witnesses testified that Kutrubes's conduct was the cause. Far from a "*post hoc* fallacy," Aplt. Br. at 49, there was a reasonable basis in the record for the district court's finding that Peak caused Atlas recoverable damages. *See Lexmark Int'l, Inc.*, 572 U.S. at 133 (Lanham Act injury "occurs when deception of consumers causes them to withhold trade from the plaintiff"). Nonetheless, Peak challenges the district court's decision to hold it liable, arguing that Atlas's supposed losses were insufficiently connected to Peak's conduct. We reject Peak's arguments and affirm the district court's damages award because it was not clear error to hold Peak responsible for Atlas's downturn following Peak's misrepresentations.

First, Peak argues that Atlas was not "primarily" in the FBS business—as it focused on selling proprietary alternatives like EquaFETAL—so Peak could not have harmed Atlas when it sold FBS to Atlas customers that had not been purchasing Atlas's FBS. Aplt. Br. at 26. Atlas responds that FBS made up a sizable chunk of its business and, more importantly, Atlas "competed for the same set of customers as Peak Serum." Aple. Br. at 24. The record supports the district court's rejection of Peak's position for the reasons Atlas submits. Kutrubes did not leave Atlas and switch industries; rather, he left Atlas to sell FBS to Atlas's customers. Meanwhile, Atlas continued trying to sell FBS or FBS substitutes to these customers. Notwithstanding the price differential between FBS and Atlas's proprietary products, Peak and Atlas competed for the same business from the same customers, who sought to put their rival products to the same purpose. The record evidence supports the conclusion that FBS and Atlas's proprietary products are competing substitutes, and any difference between them is no basis for holding that the district court clearly erred by finding that Atlas's losses followed from Peak's misrepresentations.

Next, Peak contends that the district court's finding of liability was error because the court failed to consider whether customers were still confused when they purchased Peak's products. Peak suggests that the lengthy sales process for serum products where customers sample serum over multiple weeks "breaks any causal link," and that no record evidence indicated that Peak's customers were confused at the time Peak was selling to them in mid-2015. Aplt. Br. at 41. Peak's position finds little solace in logic or law. The district court's factual finding that Peak was

11

responsible for Atlas's losses is not necessarily undermined by Peak's contentions about the timing of customer confusion. Peak's arguments seek, without legal support, to cabin its liability to sales made while customers were confused, as opposed to profits lost because of Peak's confusing misrepresentations. But the law runs against Peak, as our cases reference "initial interest confusion" under the Lanham Act, where a seller can be held liable after hooking a consumer with a misrepresentation, even if the confusion fades before a sale is made. *See Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1238–39 (10th Cir. 2006). And the district court heard expert testimony suggesting that customer confusion could damage Atlas in the absence of sales by Peak. Finally, Kutrubes testified that not every serum transaction features an extended sampling process. The district court did not clearly err.

Peak also argues that it only sold to Daemyung, Atlas's South Korean customer, after Atlas voluntarily terminated its own business relationship with Daemyung. Therefore, the argument goes, Peak cannot be blamed for this subset of losses. But the record provided the district court a reasonable basis for rejecting this contention. Atlas leadership testified at trial that the company was "leery" of working with some of Kutrubes's contacts because it had come to Atlas's attention that Kutrubes was working with Atlas customers to covertly acquire Atlas's proprietary products for himself. Aplt. App'x Vol. IV at 687–88. Trial evidence indicated that Kutrubes emailed an Atlas customer to coordinate a "straw purchase" from Atlas, where the customer would obtain EquaFETAL for Kutrubes to resell

12

without revealing the customer's allegiance to Kutrubes. The scheme fell apart when the customer inadvertently forwarded Atlas's quote to Kutrubes's Atlas email address. Relevant to the Daemyung issue, the district court heard testimony that Kutrubes nearly succeeded in acquiring EquaFETAL through a straw purchase by an Atlas customer, that Kutrubes had a very close relationship with Daemyung's sales representative, that the main reason Atlas cut off Daemyung was its concern that Kutrubes could be working with the company, and that Atlas did so to protect itself from Kutrubes's deception. Peak fails to show that the district court clearly erred by holding it liable for Atlas's lost Daemyung business.

Finally, Peak urges that there was de minimis evidence of actual confusion, and that the district court followed an expert report that assumed causation, so it was clear error to find Peak liable for all of Atlas's losses. After all, Peak suggests, it was foreseeable that Atlas's sales would fall after the company lost its National Sales Manager, and it was equally foreseeable that such a person could leverage client relationships to take business from Atlas on the merits. However, we are not conducting de novo review. Instead, we must ask only whether the record supported the district court's contrary conclusion. It did. The record makes clear that Peak deceived Atlas's clients with respect to Atlas's ability to work with them, appropriating their business through misrepresentations that took advantage of their relationships with Atlas. Whatever success Peak might have had if Kutrubes left Atlas on better terms, the district court had ample support in the record for its finding that Peak's misrepresentations caused Atlas's losses, and Peak does not suggest on

13

appeal that it offered the district court any alternative measure of damages that accounted for the situation. *Cf. U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1041 (9th Cir. 1986) ("He who has attempted to deceive should not complain when required to bear the burden of rebutting a presumption that he succeeded."). Finally, Peak's complaints about the district court's reliance on an expert report go nowhere. The district court did not assume causation. It found that Peak injured Atlas and it used the report to determine the amount of damages. That is not clear error.

Even considered cumulatively, Peak's arguments about proximate cause do not leave us with "the definite and firm conviction that a mistake has been made." *Holdeman*, 572 F.3d at 1192 (quoting *La Resolana Architects, PA*, 555 F.3d at 1177). In contrast, our review of the record reveals that Atlas put forward sufficient "evidence of injury proximately caused by [Peak's] . . . misrepresentations" to "obtain relief." *See Lexmark Int'l, Inc.*, 572 U.S. at 140 (emphasis omitted). We affirm the district court because Peak has failed to demonstrate that its factual finding that Peak caused Atlas's losses qualifies as clear error, either in whole or in part.

**b.**

We now turn to the district court's award of an additional $181,425 on Atlas's Lanham Act claim, representing Peak's profits from selling mislabeled FBS, trebled. Peak's arguments for reversal remain premised on whether its actions caused Atlas injury, so we focus on the district court's finding that Peak's mislabeling damaged Atlas. *See id.* at 133. Again, we are reviewing the relevant finding of fact for clear error. *See Holdeman*, 572 F.3d at 1192. We affirm the treble damages award

14

because the district court received sufficient evidence to support the conclusion that Peak was liable to Atlas under the Lanham Act for mislabeling serum.

Peak contends that it is "unclear how" any mislabeling could have harmed Atlas. Aplt. Br. at 38. But the evidence before the district court told a reasonable story to that effect. For example, the district court heard testimony that international customers work within the confines of complex legal regimes for serum importation, with South Korean customers subject to particularly strict requirements. By mislabeling serum as Korean eligible in the affidavit that allowed Peak to supply Daemyung, a South Korean customer, with hundreds more bottles of 31C141 serum than were purchased from RMBIO, Peak misrepresented its ability to fill Daemyung's sizable order. And the same general reasoning plausibly applies to domestic customers, as Peak's mislabeling was a representation that Peak had more of a certain lot than was actually available. *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107–08 (2014) (discussing "injury as a competitor" due to mislabeling under the Lanham Act). After all, Kutrubes testified at trial that serum sales are far easier when all serum sold comes from the same lot; if so, customers need not repeat the lengthy testing process before purchasing more. As a result, the evidence supported the conclusion that Peak's misrepresentations took serum business that could have gone to Atlas, which was enough to give Atlas a cause of action and supports the district court's finding that Peak's conduct injured Atlas. *See Lexmark Int'l, Inc.*, 572 U.S. at 133. Moreover, the possibility that the business Peak obtained by mislabeling could have gone to Atlas instead was hardly theoretical.

15

Fifteen former Atlas customers (including Daemyung), poached by Peak, purchased over a thousand bottles of serum supposedly from Lot 31C141.

Peak's statement that "no evidence [was] presented to establish any causal link between the mislabeling of product and any damage to Atlas" is incorrect. Aplt. Br. at 40. We affirm the district court's award of the profits Peak gained from selling mislabeled FBS to Atlas's customers because the record supports the finding that Peak's mislabeling harmed Atlas as a competitor.[4]

### c.

Next, we consider CUTSA. Peak's core argument on appeal, paralleling its Lanham Act challenge, is that proximate causation problems prevented a damages award on Atlas's trade secret misappropriation claim. *See id.* at 1 (framing second issue as whether the district court "erred by awarding damages" for Atlas's CUTSA

---

[4] To the extent that Peak implicitly argues in the alternative that, even if the award of mislabeling profits was proper, the treble damages were improper, we reject that contention. Under the Lanham Act, a "court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." 15 U.S.C. § 1117(a). We review a decision granting treble damages under the Lanham Act for abuse of discretion. *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1236 (10th Cir. 2000). Here, the district court's decision to award treble damages, which the Lanham Act expressly envisions, was not "arbitrary, capricious, whimsical, or manifestly unreasonable." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 989 (10th Cir. 2019) (quoting *Bylin v. Billings*, 568 F.3d 1224, 1229 (10th Cir. 2009)). Far from it, the district court explained that it "weigh[ed] the equities" and considered an award of treble damages appropriate because "Atlas lost sales to Peak Serum, Kutrubes and Peak Serum benefitted from Atlas's goodwill and reputation, and Kutrubes's and Peak Serum's mislabeling of Peak Serum Lot 31C141 were more likely than not willful." Aplt. App'x Vol. XVII at 3391. That was not an abuse of discretion.

claim).  Under CUTSA, "[d]amages may include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss."  Colo. Rev. Stat. § 7-74-104(1).  Again, Peak challenges a factual finding, so we review for clear error.  *See Holdeman*, 572 F.3d at 1192.  In evaluating Peak's argument, we keep in mind Colorado courts' caution that "[d]amages in trade secret appropriation cases are often difficult to ascertain with certainty."  *Sonoco Prods. Co. v. Johnson*, 23 P.3d 1287, 1289 (Colo. App. 2001); *see also id.* ("Under the circumstances of each case, the trial court has the responsibility to make a reasonable finding that would provide for a fair, equitable, and adequate award of damages.").  We affirm.

Peak raises the same arguments with respect to the CUTSA claim as the Lanham Act claim: "(1) Atlas and Peak Serum sold different products; (2) there is a lengthy sales process which breaks any causal link in misappropriation; (3) Atlas terminated a key customer; (4) other Atlas customers were not recent FBS customers of Atlas; and (5) Kutrubes had longstanding relationships with Atlas customers due to his longevity with that company."  Reply Br. at 16.  We rejected these arguments above in the Lanham Act context and, with the standard of review and relevant factual finding effectively unchanged, do so here as well.  Just as the evidence was sufficient to support the district court's finding connecting Peak's misrepresentations and mislabeling with Atlas's losses, the record supported the district court's finding that Peak's misappropriation harmed Atlas.  Trial testimony suggested that the information in Atlas's database was competitively advantageous because it not only

17

contained contact information for institutional serum purchasers but indicated exactly when they were likely to buy again—information that would save a prospective competitor a lot of effort and expense. Relatedly, witnesses testified that late 2014 was a difficult time to get started in the serum business, but that it took Atlas nearly a decade, with multiple salespeople, to reach the volume that Kutrubes reached within a year of his 2014 start. The district court's unjust enrichment damages followed directly from this record-supported theory of harm, as the court limited the profits awarded to those Peak earned from former Atlas customers. Peak fails to show on appeal that the causal determination underlying the district court's damages award was clear error, either in whole or in part.

We do not mean to suggest that Peak only sold serum because of Kutrubes's trade secret misappropriation—or, by extension, his misrepresentation and mislabeling. Peak is surely right that Kutrubes's preexisting relationships and industry expertise set Peak up for some measure of success. The departure of Atlas's National Sales Manager would likewise be a blow to the company's bottom line, regardless of the circumstances. But the fact remains that the district court received abundant evidence that Peak misappropriated Atlas's trade secret database content and used it to launch Peak Serum and divert Atlas's customers. And the fact remains that we are conducting deferential clear error review of the district court's factual finding that Peak's conduct injured Atlas. Keeping in mind the difficulty of determining damages in misappropriation cases, *Sonoco Prods. Co.*, 23 P.3d at 1289, we can hardly say that it was clear error for the district court to use Peak's profits as

18

a benchmark for CUTSA recovery. Far from it, the district court's decision found abundant support in the record and governing law, as CUTSA expressly envisions unjust enrichment damages. *See* Colo. Rev. Stat. § 7-74-104(1). We affirm the CUTSA award because the district court did not commit clear error by ordering disgorgement.

**d.**

Peak also challenges the district court's decision to award exemplary damages on Atlas's misappropriation claim. Under CUTSA, "[i]f the misappropriation is attended by circumstances of fraud, malice, or a willful and wanton disregard of the injured party's right and feelings, the court or the jury may award exemplary damages in an amount not exceeding the [base] award." *Id.* § 7-74-104(2). Here, the district court found that Peak acted willfully and wantonly—supporting an award of $681,946.81 in exemplary damages, matching the base award—because of "Kutrubes's concession that he had the development of Peak Serum in mind when he emailed Atlas's customer information to his personal account." Aplt. App'x Vol. XVII at 3401. On appeal, Peak challenges the willful-and-wanton finding on two grounds.[5] First, Peak claims that Kutrubes did not "permanently deprive Atlas" of its proprietary files. Aplt. Br. at 53. Second, Peak contends that it "engaged in a separate business pursuit" from Atlas, and sold a different product, so it did not

---

[5] Peak also argues that overturning the primary CUTSA award would require overturning the exemplary damages award. Having affirmed the primary CUTSA award, however, we do not have occasion to reach Peak's argument.

disregard Atlas's rights. *Id.* at 54. We review Peak's challenge to the district court's

willful-and-wanton finding for clear error. *Holdeman*, 572 F.3d at 1192.

Neither of Peak's arguments is persuasive. First, the fact that Peak's

misappropriation did not deprive Atlas of its database content permanently does not

undermine the district court's finding of "a willful and wanton disregard of the

injured party's right and feelings." Colo. Rev. Stat. § 7-74-104(2). Atlas had the

right to prevent others from using its proprietary information improperly, and it took

steps to protect its content, such as securing the database and adopting a

confidentiality policy. Critically, Peak does not challenge the district court's finding

that Kutrubes "had the development of Peak Serum in mind when he emailed Atlas's

customer information to his personal account." Aplt. App'x Vol. XVII at 3401. That

finding of deliberate intent, along with the district court's rejection of Kutrubes's

testimony that he merely emailed himself database information to work from home,

formed the basis for the district court's willful-and-wanton finding. Second, Peak's

argument that it engaged in a different line of business from Atlas is meritless for the

reasons discussed above. The district court did not clearly err when it found that

Atlas acted willfully and wantonly, so we affirm the award of exemplary damages.[6]

---

[6] Peak does not argue in the alternative that, even if we uphold the willful-and-wanton finding, the district court's discretionary decision to award exemplary damages was an abuse of discretion. *See* Colo. Rev. Stat. § 7-74-104(2) (providing that exemplary damages "may" be awarded after a finding of "fraud, malice, or a willful and wanton disregard of the injured party's right and feelings").

**e.**

Finally, we address Peak's challenge to the $308,554.50 in attorneys' fees the district court awarded Atlas for its Lanham Act and CUTSA claims. *See* 11 U.S.C. § 1117(a); Colo. Rev. Stat. § 7-74-105. On appeal, Peak explains that its theory of reversal with respect to the attorneys' fees award is dependent on the Lanham Act or CUTSA issues falling in its favor. *See* Aplt. Resp. Mot. Strike at 4–5 ("There is no complex argument as to attorney's fees. Briefly stated, [Peak's] position is that [Atlas] should not have prevailed on its claims for [false association] and CUTSA; accordingly, attorney fees should not be awarded."); *see also* Reply Br. at 19. Peak makes no other independent argument for overturning the award of attorneys' fees. *See* Aplt. Resp. Mot. Strike at 3–4. We take Peak's position as a conditional concession of the attorneys' fees issue. Because we affirm the district court with respect to the Lanham Act and CUTSA damages discussed above, Peak's concession means we need not consider disturbing the award of attorneys' fees to Atlas. We deny as moot Atlas's motion to strike or disregard the portions of Peak's briefs concerning the attorneys' fees award.

**III.**

For the reasons above, we AFFIRM.

Entered for the Court

Allison H. Eid
Circuit Judge

21